David S. Nalven, DN-2374
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, Massachusetts  02142
Telephone:  (617) 482-3700
Facsimile:   (617) 482-3003

Steve W. Berman, *pro hac vice*
Robert F. Lopez, *pro hac vice* .
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington  98101
Telephone:  (206) 623-7292
Facsimile:   (206) 623-0594

Michael P. Lewis, *pro hac vice*
LEVETOWN & JENKINS, LLP
1 Metro Center
700 12th St. N.W., Suite 700
Washington, DC  20005
Telephone:  (202) 379-4899
Facsimile:   (866) 278-2973

*Attorneys for Richard Statler, D.C., and the Proposed Class*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| RICHARD STATLER, D.C., individually and on behalf of all others similarly situated, ) ) ) | C.A. No. 2:10-cv-03798-LDW-AKT |
| Plaintiff, ) ) | FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE MAGNUSON-MOSS WARRANTY ACT, VIOLATIONS OF ARTICLE TWO OF THE UNIFORM COMMERCIAL CODE/BREACH OF CONTRACT, VIOLATIONS OF STATE CONSUMER PROTECTION ACTS, AND UNJUST ENRICHMENT |
| v. ) ) | |
| DELL, INC., a Delaware corporation, ) ) | |
| Defendant. ) ) | |

For his first amended complaint against Dell, Inc. ("Dell"), Richard Statler, D.C., on behalf of himself and all others similarly situated, alleges as follows:

## I.      INTRODUCTION

1.      In late 2003 Richard Statler, D.C., purchased several new Dell Optiplex computers direct from Dell.  Unbeknownst to Dr. Statler, however, these computers suffered from a debilitating and dangerous defect to capacitors present on the machines' motherboards. The capacitor defect rendered the motherboards defective.  These defects rendered the computers defective; they worked sporadically or not at all.  As a result, Dr. Statler was out the sizeable sums of money that he spent on these machines, as well as the costs associated with lost productivity and patient inconvenience at his chiropractic practice, where he sought to deploy them.

2.      By its own September 2005 estimate, as revealed in company documents produced in a lawsuit brought by a North Carolina company and unsealed this year, Dell sold 11.8 million computers potentially afflicted with the capacitor defects.  Most were the Optiplex model, but certain workstation and server models also were affected.  Of this 11.8 million total, Dell itself deemed 8 million computers to be at high risk for manifestation of the defects.

3.      Affected computers failed in huge numbers.  By the fall of 2005, Dell found that year-to-date, 299,000 motherboards had failed due to the defects, with a concurrent projection that 1.9 million would fail.

4.      When these computers failed, they wreaked expensive and wasteful havoc on the productivity of thousands and thousands of users.  What is worse, Dell sold most of the defective computers after it knew or should have known of the nature and extent of the problem.  And even after it became starkly evident to Dell that these computers were failing in large numbers, and notwithstanding the safety issues involved, Dell refused to respond in good faith by

contacting owners of affected machines to advise them of the defect, or by issuing a general recall.

5.      Instead, Dell misled and dealt unfairly with consumers, including Dr. Statler, who contacted it to report problems with their computers and to seek repairs or refunds.  Indeed, when Dell performed repairs on affected machines, it often replaced defective motherboards with motherboards that themselves carried the same defect, causing yet more disruption and loss of productivity to its customers.

6.      In its dealings with Dr. Statler and others throughout the nation, Dell violated the federal Magnuson-Moss Warranty Act, state contract and warranty law, various state consumer protection acts, and laws prohibiting unjust enrichment.  Dr. Statler brings this suit in order to vindicate his own rights and those of similarly situated Dell customers nationwide.

## II.      JURISDICTION AND VENUE

7.      This Court has jurisdiction over the instant matter pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1711, *et seq.*, which vests original jurisdiction in the district courts of the United States for any multi-state class action where the aggregate amount in controversy exceeds $5 million and where the citizenship of any member of the class of plaintiffs is different from that of any defendant.  The amount-in-controversy and diverse-citizenship requirements of CAFA are satisfied in this case.  Given that Dell sells its Optiplex computers nationwide, in light of recent press and other reports of widespread issues with defective Dell Optiplexes, and given the damage-multipliers available under various state consumer protection laws, Dr. Statler believes, and therefore alleges, that the aggregate amount in controversy well-exceeds $5 million.  As to CAFA's diverse-citizenship requirement, Dr. Statler is a citizen of New York while Dell has its principal place of business in Texas, such that Dell is considered a citizen of that state.

8.     Dell, a corporation doing business nationwide, transacts substantial business in this judicial district and is otherwise subject to personal jurisdiction here.  Accordingly, Dell is deemed to reside here, and venue is appropriate in this Court per the terms of 28 U.S.C. § 1391(b) and (c).  In addition, a substantial part of the events or omissions giving rise to Dr. Statler's claims occurred here, underscoring the propriety of his choice of this venue.  28 U.S.C. § 1391(b).

### III.     THE PARTIES

9.     Dr. Statler is a chiropractor who lives and practices in South Huntington, Suffolk County, New York.  Dr. Statler or his agent purchased the defective Optiplex computers via Dell's internet website, and Dr. Statler made various calls to Dell via Dell's toll-free telephone numbers, all of which Dell advertises and makes available to consumers nationwide.  In addition, Dell or its authorized agents made contact with Dr. Statler in New York.

10.     Dell is a Delaware corporation with its principal place of business in Round Rock Texas.  As a leading manufacturer and vendor of computers, Dell actively markets its products in every state in the country.

### IV.     GENERAL ALLEGATIONS

**A.     Dell's Popular Optiplex Line of Computers**

11.     Dell sold millions of its highly popular Optiplex desktop computers during and around the 2003 to 2005 timeframe.  Dell manufactured and then marketed and direct-retailed these machines to customers in all fifty states.

12.     In order to induce sales of its Optiplex computers, Dell made representations about their high quality to potential customers via numerous means, including but not limited to print advertisements, press releases, Internet website text and graphics, and representations made by authorized sales representatives.  In addition, Dell provided repair or replacement warranties

with its products covering defects in materials and workmanship, further speaking to the high

quality that Dell meant customers to expect when purchasing its products.

13.     Upon information and belief, Optiplex computers typically carried three-year

warranties.  Some, however, carried warranties of longer duration.  For example, Dr. Statler's

Optiplexes carried five-year warranties.  In addition, as explained below, Dell, as a half-hearted

gesture in response to widespread reports of defects, and without proactive direct notification to

its customers (such that many if not most affected customers were unaware of even the half-

hearted gesture made), extended the motherboard replacement aspect of its warranty through

January 2008.

**B.     Widespread Capacitor and Motherboard Defects in Dell Optiplex Computers**

14.     The following facts, except where noted, were discovered for the first time in the

summer of 2010, after review and analysis of Dell company documents referenced in a news

article on June 28, 2010 in the *New York Times*.  That article, written by Ashlee Vance and

entitled "Suit Over Faulty Computers Highlights Dell's Decline," referred to Dell documents that

recently had been unsealed in a lawsuit styled *Advanced Internet Technologies, Inc. v. Dell Inc.

and Dell Financial Services, Inc.*, No. 5:07 CV 426-H (E.D.N.C.).

15.     In spite of Dell's representations that its products were of the highest quality,

there were widespread capacitor defects in Optiplex computers manufactured and sold during the

2003-2005 timeframe, with possible spillover to machines shipped in 2006.  In or about

September 2005, according to a Dell document, that there were some 11.8 million "[a]ffected

[s]hips."  Of these "affected ships," Dell in or about September 2005 projected that 1.9 million

motherboards would, as a consequence, need to be replaced on a fix-on-failure basis.  (As

explained below, capacitors are motherboard components; when they fail, motherboards—and

the computers—often fail as well, though the computers will not necessarily fail completely all at once.)  Unfortunately, Dr. Statler's machines were among the "affected ships."

16.     According to Dell documents, the faulty capacitors were manufactured by Nichicon, a Japanese company and one of the suppliers to component manufacturers from whom Dell bought the main circuit boards, known as motherboards, for its computers.  It is presently unknown where the faulty capacitors were manufactured.

17.     Capacitors store and release electrical charges.  The chemical solution responsible for conducting electricity is known as electrolyte.  According to Dell documents, the electrolyte in the defective Nichicon capacitors contained too little phosphate.  The source of the bad electrolyte, including the country or countries of origin, is presently unknown.

18.     Capacitors resemble small cans.  Upon information and belief, the bad electrolyte in affected capacitors became unstable, causing gas buildup within the cans.  This caused the sealed capacitors to expand.  Then, in many instances, the capacitors would rupture or the seal would be destroyed.  In these instances what was left of the liquid electrolyte leaked out of the capacitors.  Worse yet, in some instances, electrolysis would occur, and high levels of gas in the cans would cause the capacitors to explode.  All of this was happening, of course, within opaque computer cabinets.

19.     All of the foregoing caused system instabilities and outright system failures.  The capacitors at issue resided on the computers' main circuit boards, which commonly are known as motherboards.  A computer's motherboard is home to, among other items, its central processing unit—its brains.  So capacitor and motherboard failures are no small matter; they go to the heart of a computer's ability to function.  As Dell itself recognized in an internal document, a computer afflicted with bad capacitors

may fail to boot or experience a thermal shutdown due to a failed motherboard which may exhibit bulged or expanded capacitors.  An affected system may exhibit the following symptoms:

- Thermal error message

- System shut down

- Inability to boot

- Blue screen error

- No post—no video error message.

20.     To Dell's customers, the capacitor defects were latent.  All they knew was that their computers were malfunctioning or had stopped working altogether.  What is more, the capacitor defect was dangerous, given the involvement of combustible and corrosive chemicals, flammable paper, electrical charges and circuitry, and the possibility of fire.

21.     Indeed, Nichicon, the manufacturer of the defective capacitors, warns in a document discovered following analysis of the unsealed Dell documents that

> [t]he main chemical solution of the electrolyte and the separator paper used in the capacitors are combustible.  The electrolyte is conductive.  When it comes in contact with the P.C. board, there is a possibility of pattern corrosion or short circuit between the circuit panel which could result in smoking or catching fire.  Do not locate any circuit pattern beneath the capacitor end seal.

(Emphasis added.)  This document, which is labeled "Application Guidelines for Aluminum Electrolytic Capacitors," pertains to those Nichicon capacitors here at issue.  It and related documents are attached to this amended complaint as Exhibit A.  Given Dell's sophistication and engineering resources, its experience with electrical componentry, and its close business and engineering contacts with Nichicon, it knew or should have known of the dangers associated with faulty capacitors.  Yet Dell chose consciously to disregard and conceal even Nichicon's

own express warning as to the danger associated with leaky and bursting capacitors such as those here at issue.

22.     In fact, following publication of the June 2010 *New York Times* article referencing documents unsealed in the *AIT* case, Dell indicated falsely to the public that there was no safety issue associated with the faulty capacitors in its Optiplex computers.  In a July 1, 2010 post entitled "Dell on the Nichicon Capacitor Issue" on *Direct2Dell* (sub-titled "A blog about Dell products, services and customers"), which appeared (and appears) on Dell's company web site, Dell's representative Lionel Menchaca wrote categorically in pertinent part: "This is not a safety issue."  This was the company line that Dell adopted years ago, *see* paragraph 33, *infra*, notwithstanding the component manufacturer's own warnings.

23.     What is more, even after learning of unusual rates of capacitor and motherboard failures in high-selling Optiplex models, and well after it should have known of them, Dell continued to sell Optiplex computers that it knew, or reasonably should have known, were themselves defective or extremely likely to exhibit the very same problems as computers that already had failed.  According to Dell, the initial Optiplex lines (the GX270 and SX270) carrying the defective Nichicon capacitors were launched in May 2003.  Dell has claimed that it first became aware of faulty capacitors in the Optiplex products at issue in January 2004 (though Dr. Statler, without discovery, does not concede the accuracy of this claim).  Dell was concerned enough about the problem at that time that it placed a temporary engineering or production hold on the Nichicon capacitors at issue (though it made no efforts to purge them from supply at that time).  Evidently this meant that for the duration of the hold, Dell would buy no more motherboards that utilized these capacitors.  The hold did not, however, mean that Dell purged affected motherboards or stopped selling affected Optiplexes.

24.     Dell claims that when it inquired of Nichicon as to the cause of the problem, Nichicon responded that a process control issue at its facilities—an issue with oxide baths—was at fault.  Nichicon then purportedly claimed to have corrected the problem.  At least some within Dell claim that Dell took Nichicon's word for it, and that Dell thereafter conducted an audit only to validate that the process had been changed.  Having so confirmed, the account goes, Dell in March 2004 released its engineering hold on the Nichicon capacitors.  These capacitors would then find their way into millions more machines unleashed on an unsuspecting market.

25.     Yet Dell's account rings hollow.  A Fall 2002 article has an unnamed Dell source confirming Dell's awareness that bad capacitors with a faulty electrolytic mix had made their way into manufacturer supply chains.  Surely this knowledge would have put any reasonable manufacturer on notice that its capacitors, whatever the source, might be similarly afflicted.  This is especially true because a Dell document indicates that in January 2004, it had begun to see "[b]ulged/vented" capacitors on defective motherboards.  These are among the very symptoms caused by the faulty electrolyte referenced in the Fall 2002 article.  It is unbelievable that a sophisticated manufacturer such as Dell, and one with enormous scientific and engineering resources, would have missed the bad electrolyte issue.  Certainly Dell should not have, considering especially the critical uses to which it knew that its products would be put.

26.     In any event, Dell continued to sell millions of Optiplex computers made with the bad capacitors.  Along the way Dell became aware of more and more manifestations of the defect.  Then, according to a Dell document, Nichicon called a meeting in April 2005 and advised Dell that effective August 2004, supposedly as part of a continuous improvement program, it (Nichicon) had begun to increase phosphate levels in the subject capacitors.

27.     The next month following this meeting, in May 2005, Dell, according to a company document, again placed the subject Nichicon capacitors on hold.  Two months went by, during which time Dell was receiving more and more reports of the capacitor defect.  Then in July 2005, according to an account within Dell, Dell hired an independent engineering firm to perform failure analyses on the Nichicon capacitors.

28.     In August 2005, again according to a Dell document, the independent engineering firm reported phosphate degradation in capacitors produced after March 2004, March 2004 being the month in which Nichicon reportedly told Dell that it had taken care of the capacitor defect by way of altering its oxide bath process.  About this same time, in August 2005, Dell made a claim to Nichicon for expenses tied to the first round of defective capacitors, *i.e.*, those produced before Nichicon altered the bath process.

29.     Thus, by August 2005 at the latest, an independent engineering firm had confirmed to Dell that phosphate-deficient electrolyte was causing the mass defect, and that it had been causing the defect all along.   Because Nichicon did not begin adding phosphate to the subject capacitors until August 2004, the supply of capacitors produced through at least July 2004 would have the very same level of defects as the capacitors produced prior to that time.  What is more, about this same time, according to a former Dell senior manager, Dell believed that there likely still was not enough phosphate in the electrolyte mix post-August 2004, such that the same defect would continue to manifest, though Dell projected internally that the defect would manifest to a lesser degree from that point forward.

30.     Meanwhile, Dell continued to sell Optiplex computers that bore the faulty capacitors.  Indeed, it knew that certain workstations and server models outside the Optiplex family also bore the same defects.  Evidently, it continued to sell those as well.

31.     According to a Dell document "[u]pdated September 20, 2005," and marked "Dell Confidential—for Internal Use Only" and entitled "OptiPlex GX270/SX270/GX280 REACTIVE Position Statement/Q&A," "actions had been taken" by that time "to suspend this [Nichicon] component from Dell AVL [Approved Vendor Lists]."  This statement was made in response to the question: "There are no problems with current GX280s being shipped, correct?"  The same document also stated that "board manufacturing has removed this component from production and service stock has been purged."  (It is not known precisely when these actions were undertaken.)  Yet the same response ended with: "Actions are underway to purge supply chain stock of any remaining boards that may still be in the supply chain."  In other words, in September 2005, Dell was continuing to ship computers with the faulty capacitors inside.

32.     It bears repeating that Dell never issued a recall of these computers or sent out an alert or notice to buyers of potentially affected machines, even though as a direct seller it had contact information for all buyers of potentially affected machines.  Dell even underscored the virtue of the direct model in this regard to a complaining customer; as a Dell representative wrote on February 17, 2005: "You might remember a while [sic] back, Dell identified a large batch of at-risk notebook batteries, and proactively notified all customers that bought units with those batteries, and replaced them, in most cases, before they ever failed.  This is one of the strengths of our direct model—we can fix problems early, because we know who the end user is, and can contact them before an issue impacts them."

33.     Yet to the question of "Why has Dell not taken a more proactive approach to rectifying the issue?" as raised in the September 20, 2005 internal document referenced above, Dell answered with the following company line: "Our approach to this issue delivers the best customer experience because it minimizes disruption.  There are no safety or data loss issues

associated with the faulty capacitors and only a small number of customers are affected."  How

Dell could claim that no data loss was associated with the problem when it could cause

computers to shut off before users had an opportunity to save their work, and how Dell could say

that "only a small number of customers are affected" when another internal document generated

at about the same time showed that there had already been 299,000 failures year-to-date, with a

projection of 1.9 million defective motherboards subject to being replaced on a fix-on-fail basis,

is corporate spin at its most disingenuous.

34.     Furthermore, as the capacitors' own manufacturer, Nichicon, warns, there are

indeed grave safety issues associated with these faulty components.  They can "smok[e] or

catch[] fire."  Dell knew or should have known of this danger, yet it chose to conceal that

danger—in spite of the compounding fact that the affected computers were of small form factors,

which, with warmer internal temperatures, exacerbated the tendencies of these bad capacitors to

fail.  Indeed, as set forth above, Dell recently stated via its web site that there are no safety

concerns, even as affected computers remain in service.  Affected motherboards contain many

capacitors, and they may not all fail at once; the computer may hobble along, displaying vexing

symptoms that could be attributed to several different causes.

35.     As Dell Product Manager for Flexible Computing Solutions James Hutten put it

when he was deposed on June 4, 2009, in the *AIT* case:

> The—the capacitor actually—you'll start to see the—a bulging of the—of
> the top of the capacitor, because the internal chemicals start to break down inside
> the capacitor.  You'll see a bulging at the top.  As that capacitor fails, you—the—
> you could—the—the GX270 may no longer what we call boot, you know, turn
> the power on.  It may try to start.  It may not come up.  It may have intermittent
> failures.
>
> So it—depending on which capacitor failed in the design and how it
> failed, sometimes they fail very slowly, other times they would just fail very
> quickly.  And so it could—there's no one—there's no one—it didn't—you know,

> it failed and here's what you see.  You could see different symptoms of the
> failure, uh huh.

Accordingly, the customer very well might not know that a malfunctioning computer is

experiencing capacitor failure, which in turn poses a fire hazard, not to mention the danger posed

by the corrosive chemicals when expressed from the capacitors.  (Dell knew well that chemicals

would leak from the bad capacitors.  As merely one example, Dell received an email dated

November 4, 2005 from a representative of Palm, advising that "[t]he capacitors [in its GX280

Optiplexes] bulge then leak fluids."  Fluid leaked out of Dr. Statler's bad capacitors as well.

Indeed, "leak" is too imprecise a word for what happened with some bad capacitors.  An Internet

post dated July 1, 2010, and found at http://www.fauxrensix.com/2010/07/wtf-dell/, describes

how, when performing tech support at a company with affected computers, the author

encountered a computer that was crackling and hissing.  When he opened the case, a stream of

capacitor fluid shot "a foot out of the chassis" into his eye.)  Further, investigation is ongoing to

determine if Dell or its subsidiary Dell Financial Services has recently sold used or refurbished

Optiplex computers of the affected vintage that contain defective or potentially defective

Nichicon computers.

     36.    As Dell's former Director of Client Quality William Luhrs, III, described when he

was deposed on February 5, 2010, Dell policy is to treat defects implicating safety differently

from the way it treated the capacitor defect.  According to Mr. Luhrs:

> So the period where Dell would proactively notify was safety related, so
> that's—and that would be in a—you know, I've had some situations with battery
> recalls and so you go through the Consumer Safety Protection Agency—I may
> have the acronym wrong.  So that's when we would physically go and
> proactively, from a save—you know, from a safety perspective go that route. . . .
>
>     . . .

> Safety's a whole different animal, right?  Don't play around with safety.
> All right.  We broadcast that to the world.  We physically phone them, hunt them
> down, try to find those machines. . . .

And though Mr. Luhrs goes on to protest that Dell did not know whom exactly to call because

not all computers in the date-range at issue would have defective computers, millions, according

to Dell's own projections, *would* experience the defect.  Further, Dell, because of its direct sale

model, had contact information for all potentially affected consumers—yet it chose to

"emphasize uncertainty," *see* paragraph 39, *infra*, and not to notify customers proactively that

they might well have purchased computers with defective—and therefore dangerous—

capacitors.  At the least, consumers should have been affirmatively apprised of likely capacitor

defects in their machines.

37.     Indeed, the consumer agency to which Mr. Luhrs referred—the Consumer

Product Safety Commission ("CPSC")—should have been notified of the capacitor defect, but

the plaintiff has found no evidence that such notification took place.  The CPSC would have

been keenly interested.  A recent search of its website reveals four press releases referring to

product recalls owing to defective capacitors.  The first is dated May 25, 2000, and it refers to a

recall of 34,000 Universal Security Instruments smoke alarms.  The press release states in part:

"A capacitor in the alarm can burn out, releasing smoke and melting the cover."  The second is

dated July 3, 2003 (rev. March 30, 2004), and it refers to a recall of Toshiba televisions.  The

press release states in part: "If the capacitors short circuit due to a very high electrical surge, such

as from a lightening strike, the metal parts of the television could present a shock or

electrocution hazard."  The third is dated June 16, 2004, and it refers to a recall of Linn audio

amplifiers.  The press release states in part: "The amplifier's capacitors can overheat, blow a

fuse, and damage the products to which they are connected, presenting a fire hazard."  The fourth

is dated November 2, 2010, and it refers to a recall of Black & Decker and Haier chest freezers.

The press release states in part: "A capacitor in the freezer's circuitry can overheat, posing a fire

hazard."  These recalls illustrate that bad capacitors can in fact pose serious safety hazards,

contrary to Dell's concealments from, and misrepresentations to, its customers.

38.     Optiplex computers were promoted and sold for business use (though home users

could and did buy them—after all, these products were simply desktop computers that could and

did run the very same software and operating systems, such as Windows XP, as any other

desktop computer), and many customers experienced slowdowns or shutdowns of critical

operations when the capacitor defect manifested.  This, in turn, led to major losses of

productivity, time, and money.

39.     Dell, however, responded to complaints about these defective Optiplex computers

with partial truths, runarounds, and misdirection.  Indeed, upon information and belief, it became

Dell's actual policy to obfuscate: "to emphasize uncertainty," as a document from the Dell Client

Product Group put it.  Customers were left to guess at what was causing their computers to

behave erratically or to fail completely (Dell itself referred to the problem as "latent"), though

Dell knew well what truly was going on.

40.     In fact, according to a Dell former senior manager, Dell did not make a public

statement about the mass defects until around *October-November 2005*, and even then the

statement was cryptic and vague; it was not intended to communicate to customers that their

machines might be suffering from capacitor defects.  According to the former senior manager,

the belated statement merely said something to the effect that Dell was taking a larger warranty

accrual because it was seeing higher-than-expected failure rates due to components from a sub-

tier supplier.  Moreover, the statement was never communicated directly to affected or

potentially affected customers, even though Dell knew the identity of its customers due to its direct sales model.  Customers including Dr. Statler certainly could not have understood such a statement to mean that their computers were suffering from known capacitor defects, if they even saw the statement (certainly Dr. Statler did not see the statement, and most other consumers likely did not, either).  Again, it bears repeating that capacitor problems are easily misdiagnosed, given that the symptoms manifested can also be caused by other faults and defects.  Yet as another entry from the Dell Client Product group document put it, under the heading "Sales Do's and Don'ts": "Don't bring this to customer's attention proactively," and "Don't promise to exchange any units that have not failed."  Doing as little harm to its bottom line as possible was more important to Dell than doing right by its customers and honoring the trust they had placed in its heavily promoted and not inexpensive products.

41.     Some of Dell's customers, however, especially larger customers, received special treatment from Dell, with so-called Proactive Field Replacements or Customer Field Actions, whereby Dell would agree to replace defective-capacitor laden motherboards before they failed, or to supply motherboards in advance of failure.  Some also were given critical information about the defects, how the defects were manifesting, and what these customers might expect in the future.  But most customers, like Dr. Statler, were not so lucky.

42.     Moreover, even ventures into proactive replacement territory did not always end well.  An obscure August 30, 2005 Internet blog article on the subject was noticed by Dell (though it certainly was not noticed by Dr. Statler or most if any other customers); it was entitled, "Dell Won't Recall Defective Motherboards."  The article told the story of a reader who had purchased "'nearly two hundred Dell GX270s.'"  As the reader put it, "'This is an information business that we're in, so we depend on these systems to get our work done and keep

revenue coming in the door.  Earlier this year we began to experience problems such as random

reboots and power-downs with some of the GX270s.  At first we thought it might be a virus or

spyware outbreak, but we eventually realized what we were experiencing is a systemic problem

with Dell's motherboard.  There's an issue with the capacitors that cause them to start 'bulging'

and then eventually burst.'"

43.     The article went on to note: "The wide range of symptoms can mimic power

supply, fan, monitor, RAM and disk drive problems,[1] so just identifying the true source is

difficult."  While Dell replaced motherboards that "had clearly gone bad," it was not replacing

them proactively.  The article continued: "But as the failure rate for the reader's GX270s climbed

over ten and then twenty percent, he realized that just replacing the machines as they broke was

going to be a disaster for his company.  "'The sheer manpower to troubleshoot and assist in

getting Dell to come in and replace motherboards one at a time has been very costly.'"  "'We've

probably spent close to $50,000 just in personnel time on this issue, which is a lot for a small

staff.  And that's not counting the lost productivity for our users from the time their systems

started exhibiting flaky behavior.'"

44.     Eventually the reader learned that Dell was replacing certain customers'

defective-capacitor motherboards before they failed.  His company began to negotiate with Dell

for such a proactive replacement, and Dell agreed to the replacement.  Then, however, Dell

"'backed off due to what they called a "global motherboard constraint."'"  After that, the best

deal Dell offered was a "'very good discount on trading in [the company's] unrepaired 270s for

280s.'"  The reader, of course, was "quite reluctant to take that deal for a number of reasons."

And when the blog writer asked Dell for a policy statement on GX270 replacements, Dell did not

_____

[1] Dell has also acknowledged hard-drive and power supply defects among the Optiplex
models at issue.

respond.  But the article did give rise to the following August 30, 2005 email within Dell: "Bill, Think you were working on legal response for articles rebuttals previously . . . . this is stirring up large here in the segments, would like to know who to engage in PR or PGMktg to get the right response to talking points.  Thoughts?"

45.     As the foregoing makes plain, replacement motherboard supplies ran very tight, especially for proactive replacement or supply.  But even for fix-on-fail customers such as Dr. Statler (and the majority of those affected, given that proactive replacement for all was *not* Dell's policy), fixes often went badly.  First, of course, there was the disruption to business and time and productivity lost as a consequence.  But second, a more serious problem often arose: for many repairs, Dell was supplying replacement motherboards that themselves carried defective Nichicon capacitors.  These could and did fail, causing yet more disruption and lost time and money, as Dr. Statler, unfortunately, well knows.

**C.     Dr. Statler's Experience With Defective Dell Optiplex Computers**

46.      Near the end of calendar year 2003, Dell sold Dr. Statler four Optiplex computers marketed for desktop use and one additional Optiplex computer marketed as suitable for use as a server.  Dell's affiliate, Dell Financial Services, handled financing of the purchase on a lease-to-own basis.  Dr. Statler's computers carried Dell's five-year warranties/repair-or-replacement contracts.

47.     Dr. Statler bought the machines for use in his chiropractic office.  Each would run software critical to his practice.  He deployed the four desktop Optiplexes at patient treatment areas; he deployed the fifth Optiplex computer in another area of his office, where it handled server functions.

48.     Sometime after Dr. Statler purchased these computers, each began to manifest serious operational issues.  They began to behave erratically, sometimes causing their monitors

to blink on and off, and at other times shutting down by themselves.  Sometimes they would display blue screens—the so-called blue-screen-of-death.  In some instances Dr. Statler could get the computers to turn on again; at other times he could not.  Each time these issues would surface, they caused severe disruptions to Dr. Statler's practice.  These disruptions interrupted time with patients, and they cost productivity (and, therefore, money) as Dr. Statler was unable to run the business side of his practice as efficiently as working computers would have allowed him to do.

49.      Dr. Statler reported these issues to Dell customer service.  In response, Dell agents did not offer any information as to what the underlying cause of the problem might be.  Rather, they would indicate that the problem was not Dell's—that it was software related.  When Dr. Statler persisted, after in some instances hiring his own technician, at his expense, who would indicate that the problems were not software-related, Dell would dispatch service personnel who purported to fix the defective computers.  In some cases these purported fixes involved replacement of the computers' motherboards.  "Repairing" the defective computers further disrupted Dr. Statler's practice.  At no time did Dell representatives advise Dr. Statler that bad capacitors in his computers posed a safety hazard.

50.      But the problems persisted, even after "repairs," some of which occurred late in his warranty period.  This was due, upon information and belief, to Dell's replacement of faulty motherboards with other faulty motherboards that themselves were populated with defective capacitors, including from Nichicon.  Again, these problems disrupted Dr. Statler's practice.  And indeed, at any one time during this time period, at least one to two units was or were not working.

51.     The bottom line is that Dell's attempts to repair were failures.  Three of the defective computers quit completely; another one works sporadically, and with continuing difficulty.  Sadly, Dr. Statler's experience with Dell and its defective Optiplex computers is shared with so many other customers throughout this country.  The harm caused calls for redress; hence, this suit.

## V.     CLASS ACTION ALLEGATIONS

52.     Dr. Statler brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, specifically Rules 23(b)(2) and 23(b)(3), on behalf of the following class:

> All individuals and entities in the United States who own or have owned (including by way of lease financing) any Dell Optiplex model SX270, GX270, and/or GX280 computers, in any form factor.  Excluded from the class are officers, representatives, or agents of Dell.  Also excluded from the class are the judge to whom this case is assigned as well as members of the judge's immediate family.  Individuals suffering personal injury, wrongful death, or emotional distress related to the referenced Dell Optiplex computers likewise are excluded from the class.

53.     Upon information and belief, there are tens if not hundreds of thousands of members, in the above-described class.  The exact number and identities of fellow members, however, are presently unknown to Dr. Statler, but they are known to Dell and ascertainable via appropriate discovery.

54.     Among the questions of law and fact common to the class are:

a.     Are the Dell Optiplex desktop computers at issue in this lawsuit, or components of those computers, including capacitors or motherboards, defective?

b.     Are faulty capacitors a cause of the widespread problems and failures that Dell customers experienced with their Optiplex computers?

c.     When did Dell realize that the Optiplex computers it was placing on the market were defective?

d.      Did Dell place Optiplex computers on the market with the knowledge that they were defective, or likely to be defective?

e.      Were the defects in the Dell computers latent to Dell's customers?

f.      Did Dell have a program or programs in place to discourage consumers who bought defective Optiplex computers from seeking all remedies lawfully available to them, including by way of purporting to "repair" affected computers with parts that it knew to be defective or likely to be defective?

g.      Did (and do) the faulty capacitors here at issue pose safety hazards to consumers and third-parties?

h.      Did Dell have and violate duties to warn its customers of safety hazards associated with faulty capacitors?  Did Dell act on a policy to conceal these safety hazards from its customers?

i.      Has Dell advertised its Optiplex computers as having characteristics that they do not have?

j.      Has Dell acted deceptively or unfairly in the marketing of its Optiplex computers?

k.      Has Dell acted deceptively or unfairly in addressing the complaints of consumers who purchased or acquired defective Optiplex computers, including those who sought repairs or replacements?

l.      Are Dell's warranty documents and published policies subject to reformation under the circumstances at issue in this suit?

55.     Dr. Statler's claims are typical of the class because Dr. Statler and all members of the class were injured in the same manner by Dell's violations of provisions of the Magnuson-Moss Warranty Act; by its violations of provisions of Article 2 of the Uniform Commercial

Code, as enacted in the various states, and related principles; by its unfair or deceptive acts and practices as defined by the consumer protection laws of the various states; and by Dell's unjust enrichment.

56.     Dr. Statler will protect fully and adequately the interests of all members of the class.  Dr. Statler has retained counsel who are experienced in class-action, including nationwide and multi-state class-action, litigation.  Dr. Statler has no interests that are adverse to, or in conflict with, other members of the class.

57.     The questions of law and fact common to the members of the class predominate over any questions which may affect only individual members.

58.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The class is readily definable, and prosecution as a class action will eliminate the possibility of duplicative litigation, while also providing redress for claims which otherwise would be too small to support the expense of individual litigation.

59.     Furthermore, Dell has acted or refused to act, as alleged herein, on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

## VI.     STATUTES OF LIMITATION

60.     Plaintiff restates the preceding paragraphs and incorporates them here by this reference.

61.     Dr. Statler's claims accrued at the earliest on the last date on which repairs were made or attempted on his computers and it became apparent that those repair efforts were unsuccessful, or when he discovered his injuries, whichever was later.

62.     Furthermore, the causes of action alleged herein accrued upon discovery of defects in Dr. Statler's computers.  These defects were latent, as admitted by Dell, and, moreover, Dell took steps to conceal the truth about them as described herein; accordingly, Dr. Statler did not discover, and could not have discovered, the defects through reasonable and diligent investigation.  In fact, on more than one occasion, when Dr. Statler would call Dell to report a problem with an affected computer, such as a blue-screen, Dell telephone representatives, in spite of Dell's knowledge of the defects, would advise Dr. Statler that he was experiencing a software-related issue for which Dell was not responsible.  In addition, Dell actively concealed the safety hazards posed by the defective capacitors at issue, and internal documents which refer to the company line denying safety issues suggest that it made affirmative misrepresentations on safety to customers as well.  Because the defects and dangerousness thereof were latent, and because Dell withheld knowledge of them and also made obfuscating misrepresentations thereto, Dr. Statler could not discover them on his own.  Also, due to Dell's failure to disclose, concealment, or both, regarding the defects here at issue, Dr. Statler did not discover the cause of his Optiplex computer malfunctions as early as he might otherwise have.

63.     In addition, any otherwise applicable statutes of limitation have been tolled under the doctrine of fraudulent concealment by way of Dell's knowing and actual concealment of the facts as alleged in this complaint.  Dr. Statler was kept in the dark by Dell as to information vital to his claims, including the safety hazards that defective capacitors posed to him and those around him, without any fault or lack of diligence on his part.  As referenced above, despite Dell's knowledge of widespread capacitor defects, Dell representatives misled Dr. Statler as to the true cause of the grave issues he reported with his machines.  Dell never advised him that it knew there was a widespread and recurring defect with capacitors and, consequently, the

motherboards on which they resided.  Rather, Dell concealed that information from him, such that he was left in the dark about the true cause of the computer problems he was experiencing. Given Dell's behavior and the latent nature of the defects alleged, Dr. Statler was unable to discover the true causes for the malfunctioning of his Optiplex computers.

64.     Also, by way of knowingly, affirmatively, and actively concealing facts vital to Dr. Statler's causes of action, including information as to the true character, quality, and nature of his Optiplex computers and the defects afflicting them, which posed safety hazards, Dell should be and is estopped from relying on any otherwise potentially applicable statutes of limitation in this action.  Again, Dell failed to communicate its knowledge of the defects here at issue to its customers, including Dr. Statler.  Dr. Statler was left to think that his problem was isolated, and not a problem that was known to Dell, widespread, and likely to recur given Dell's use of replacement motherboards bearing the same bad capacitors.  Further, Dell so behaved when in fact it knew, or should have known, including by way of Nichicon's own pronouncements, that the contrary was true.  For this reason, too, Dell should be and is estopped from relying on any otherwise applicable statutes of limitation in this action.  Finally, because Dell violated its duty to warn of the dangerous defects in the subject computers, thereby concealing from Dr. Statler a critical basis for suit, it likewise should be and is estopped from claiming the benefits of otherwise potentially available statutes of limitation in this action.

65.     The foregoing allegations of this Statutes of Limitation section apply to the claims of members of the proposed class as well.  They similarly were deceived as described in this section of the complaint and throughout, the preceding allegations having been incorporated here by reference.

## VII.   NO ENFORCEABLE ARBITRATION AGREEMENT OR CLASS-ACTION BAR

66.     Dell purports to sell its computers pursuant to certain Terms and Conditions.

67.     These Terms and Conditions contain arbitration provision and no-class-action provisions.

68.     The arbitration provision and no-class-action provision were not negotiated but instead were unilaterally imposed by Dell, the party with hugely disproportionate bargaining power, in order to deny Dr. Statler and members of the proposed class their day in court.  As such, both provisions are unconscionable, in violation of applicable law, and unenforceable.

69.     Moreover, the sole and exclusive arbitration forum, the National Arbitration Forum, no longer conducts arbitrations in matters such as this one.  Accordingly, both the arbitration and no-class-action provisions fail, and this case may and should be conducted in this Court.

## VIII.   APPLICABLE LAW

70.     New York law should apply to Dr. Statler's claims.  Dell reached into New York to do business with Dr. Statler, who resides and works in New York.  Furthermore, the computers were purchased in, and shipped and delivered to, New York.

71.     For purposes of an applicable law determination, New York has the most significant contacts to Dr. Statler's claims; therefore, its law should apply.

72.     New York has an interest materially greater than that of any other state in enforcing the rights and remedies granted to New York consumers under the New York laws pled here.  These rights and remedies further strong and fundamental public policies of the state of New York, and they should be given effect here.

73.     In addition, where Dr. Statler's breach of contract or warranty claims are concerned, Dell does not purport to select the law of another state for application because its warranty document is separate from its Terms and Conditions, and there is no choice-of-law provision in its warranty document.

74.     As to the claims of members of the proposed class, the law of their respective states apply to their claims as stated herein.  In addition, as to their claims and the claims of Dr. Statler, federal law applies as alleged below.

## IX.     CLAIMS FOR RELIEF

### COUNT I

### Violations of Magnuson-Moss Warranty Act

75.     Plaintiff restates the preceding paragraphs and incorporates them here by this reference.

76.     The federal Magnuson-Moss Warranty Act ("Magnuson-Moss" or "Act"), 15 U.S.C. §§ 2301-2312, is a consumer protection regime designed to supplement state warranty law.  Computers are consumer products within the meaning of the Act; therefore, its terms apply here, whatever the intended uses of the Optiplex computers.

77.     Magnuson-Moss provides a cause of action for breach of warranty.  15 U.S.C. § 2310(d)(1).  Dell has breached its repair or replacement warranty by failing to repair the affected goods completely or to replace them as necessary.  It also breached the implied warranty of merchantability by selling affected computers with dangerous capacitor defects.

78.     Dell's acts and omissions in violation of Magnuson-Moss, including by way of marketing and vending goods that it knew or should have known were defective, by misleading customers as to the cause of malfunctions and failure of their computers, and by purporting to repair computers with defective parts that it knew would fail, or that it knew had a significant

chance of failing, and by way of concealment of safety hazards posed by the defective capacitors

(including the failure to notify customers), as well as the failure to undertake an appropriate

recall, are "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive

acts or practices in or affecting commerce," and, accordingly, they are unlawful.  15 U.S.C.

§ 2310(b); 15 U.S.C. § 45(a)(1).

79.     Dr. Statler and the class members he seeks to represent have suffered damages as

a result of Dell's breaches of warranty and other violations of Magnuson-Moss, including but not

limited to refunds of the purchase price of their defective computers, given the nature and extent

of the defects, with interest.  In the alternative, Dr. Statler and the class are entitled to repair or

replacement of their defective computers, per Dell's warranty obligations.

80.     Magnuson-Moss provides for "other legal and equitable" relief where there has

been a breach of warranty or failure to abide by the obligations that it imposes.  15 U.S.C.

§ 2310(d)(1).  Dr. Statler and the class he asks to represent seek a reformation of Dell's warranty

documents to comport with Dell's obligations under Magnuson-Moss, including as necessary

extensions of warranty durations.  In addition, they ask that Dell be enjoined from continuing to

act unlawfully as alleged herein, including with respect to its practices aimed at misleading

consumers who purchased its defective products.  They also ask that Dell be required to notify

customers of affected and potentially affected computers and to conduct an appropriate recall of

the subject machines.

81.     Magnuson-Moss also provides for an award of costs and expenses, including

attorneys' fees, to prevailing consumers in connection with the commencement and prosecution

of lawsuits thereunder, unless the Court in its discretion determines that such an award would be

inappropriate.  15 U.S.C. § 2310(d)(2).  Dr. Statler and the prospective class intend to seek such

an award, including an award for expert witness fees, as prevailing consumers at the conclusion of this lawsuit.

## COUNT II

### Violations of Article 2 of the Uniform Commercial Code/Breach of Contract

82.     Plaintiff restates the preceding paragraphs and incorporates them here by this reference.

83.     Where adopted, including in the state of New York, Article 2 of the Uniform Commercial Code (sometimes "U.C.C.") governs transactions in goods, including agreements predominantly for the sale of goods.

84.     Dell extends an express written warranty, denominated a limited warranty, directly to its customers, including to Dr. Statler and those others who purchased the computers at issue in this lawsuit.  *See* N.Y. U.C.C. § 2-313.  By way of that warranty, Dell promises, *inter alia*, to repair or replace covered products that are defective in materials or workmanship.

85.     In addition, Dell offered additional motherboard replacement coverage to customers with Optiplex SC270, GX270, and GX280 that exhibited capacitor defects; the expressed term of that additional coverage was "for 5 years from date of purchase, or until 31-January-2008, whichever comes first."

86.     Dell breached its warranty, *i.e.*, its contract or contractual obligation, by failing to repair or replace defective computers, including Dr. Statler's, as promised.  *See, e.g.*, *Long Island Lighting Co. v. Stone & Webster Engineering Corp.*, 6 F.3d 876, 888-90 (2d Cir. 1993).

87.     In addition, an implied warranty of merchantability attended Dell's sale of computers to Dr. Statler and members of the prospective class.  *See* N.Y. U.C.C. § 2-314.  Dell violated this implied warranty of merchantability by selling computers to Dr. Statler and members of the prospective class that bore capacitor and motherboard defects; these defects

rendered the computers unfit for the ordinary purposes for which such goods are used.  N.Y. U.C.C. § 2-314(c).  Further, the capacitor defects in these machines, including in Dr. Statler's, posed safety hazards, which hazards also rendered them unfit for the ordinary purposes for which such goods are used.  What is more, the computers at issue, including Dr. Statler's, were not of fair average quality within the description thereof, due to the capacitor defect.  N.Y. U.C.C. § 2-314(b).  The dangerousness of the defects at issue, including in the machines sold to Dr. Statler, further rendered them not of fair average quality within the description thereof.

88.     The Uniform Commercial Code, including Article 2 on Sales, was meant to harmonize the law governing commercial transactions across the United States.  Every state in the Union has adopted the Uniform Commercial Code (though Louisiana has not adopted Article 2 on Sales).

89.     Dell has marketed its computers nationwide throughout and around the class period.  Upon information and belief, Dell has behaved similarly in its dealings with consumers across the United States.  Under N.Y. U.C.C. § 2-725, Dr. Statler's claim for breach of Dell's contracts did not accrue until Dell last failed to meet its repair or replacement obligations either within Dr. Statler's five-year warranties or the extended replacement warranty offered by Dell.

90.     The corresponding provisions of Article 2 of the U.C.C. apply with respect to the claims of putative class members in the 48 states (and the District of Columbia) outside of New York where they have been adopted, whether such claims accrued within the time period of Dell's express repair or replacement warranty contract or the extended replacement warranty offered by Dell.  Companion codifications of Article 2 of the U.C.C. are found as follows:

a.     Ala. Code § 7-2-101, *et seq.*

b.     Alaska Stat. § 45.02.101, *et seq.*

c.      Ariz. Rev. Stat. § 47-2101, *et seq.*;

d.      Ark. Code § 4-1-2, *et seq.*;

e.      Cal. Com. Code § 2101, *et seq.*;

f.      Colo. Rev. Stat. § 4-3-101, *et seq.*;

g.      Conn. Gen. Stat. § 42a-2-101, *et seq.*;

h.      6 Del. Code § 2-101, *et seq.*;

i.      D.C. Code § 28:2-101, *et seq.*;

j.      Fla. Stat. § 672.101, *et seq.*;

k.      Ga. Code § 11-2-101, *et seq.*;

l.      Haw. Rev. Stat. § 490:2-101, *et seq.*;

m.      Idaho Code § 28-2-101, *et seq.*;

n.      810 Ill. Comp. Stat. § 5/2-101, *et seq.*;

o.      Ind. Code Ann. § 26-1-2-101, *et seq.*;

p.      Iowa Code § 554.2101, *et seq.*;

q.      Kan. Stat. § 84-2-101, *et seq.*;

r.      Ky. Rev. Stat. § 355.02.101, *et seq.*;

s.      Me. Rev. Stat. § 11. 2-101, *et seq.*;

t.      Md. Com. Law Code § 2-101, *et seq.*;

u.      Mass. Gen. Laws 106:2-101, *et seq.*;

v.      Mich. Stat. § 440.2101, *et seq.*;

w.      Minn. Stat. § 336.2-101, *et seq.*;

x.      Miss. Code Ann. § 75-2-101, *et seq.*;

y.      Vernon's Mo. Rev. Stat. § 400.2-101, *et seq.*;

z.      Mont. Code Ann. § 30-2-101, *et seq.*;

aa.     Neb. Rev. Stat. § UCC-2-101, *et seq.*;

bb.     Nev. Rev. Stat. § 104.2101, *et seq.*;

cc.     N.H. Rev. Stat. § 382-A:2-101, *et seq.*;

dd.     N.J. Stat. Ann. § 12A:2-101, *et seq.*;

ee.     N.M. Stat. Ann. § 55-2-101, *et seq.*;

ff.     N.Y. Gen. Bus. Law § UCC-2-101, *et seq.*;

gg.     N.C. Gen. Stat. § 25-2-101, *et seq.*;

hh.     N.D. Cent. Code § 41-02-01, *et seq.*;

ii.     Ohio Rev. Stat. § 1302.01, *et seq.*;

jj.     Okla. Stat. tit. § 12A-2-101, *et seq.*;

kk.     Or. Rev. Stat. § 72.1010, *et seq.*;

ll.     13 Pa. Consol. Stat. § 2101, *et seq.*;

mm.    R.I. Gen. Laws. § 6A-2-101, *et seq.*;

nn.     S.C. Code Laws § 36-2-101, *et seq.*;

oo.     S.D. Code Laws § 57A-2-101, *et seq.*;

pp.     Tenn. Code § 47-2-101, *et seq.*;

qq.     Tex. Bus. & Com. Code § 2.102, *et seq.*;

rr.     Utah Code Ann. § 70A-2-101, *et seq.*;

ss.     Vt. Stat. Ann. tit. 9A, § 2-101, *et seq.*;

tt.     Va. Code Ann. § 8.2-101, *et seq.*;

uu.     RCW § 62A.2-101, *et seq.*;

vv.     W. Va. Code § 46-2-101, *et seq.*;

ww.    Wis. Stat. § 402.101, *et seq.*; and

xx.     Wyo. Stat. § 34.1-2-101, *et seq.*

As to the claims of Louisiana residents, the Civil Code of that state applies.

91.     Dr. Statler and the prospective class are entitled to remedies available under Article 2 of the Uniform Commercial Code, including but not limited to refunds of the purchase price of their defective computers, given the nature and extent of the defects, with interest.

92.     In the alternative, Dr. Statler and the prospective class are entitled to repair or replacement of their defective computers, per Dell's contractual obligations as described above.

## COUNT III

### Violations of Consumer Protection Statutes

93.     Plaintiff restates the preceding paragraphs and incorporates them here by this reference.

94.     Dell's conduct and omissions, as alleged in this complaint, constitute unfair or deceptive acts or practices in violation of New York's Consumer Protection From Deceptive Acts and Practices Act, N.Y. Gen. Bus. § 349 ("Section 349").  Dell's actions were consumer-oriented, materially misleading, and Dr. Statler and the prospective class suffered injury as a result.

95.     Dell's violations of law include, but are not limited to:

a.     Placing on the market computers that were known to be defective, or that were known as likely to be defective, while representing explicitly and implicitly that those products were of high quality and free from material defects;

b.     Failing to advise its customers, including Dr. Statler and members of the prospective class, of known and suspected defects in a proactive, transparent, and timely fashion, and instead adopting a policy of obfuscation and concealment, even though the defects at issue posed grave safety hazards as described by the manufacturer of the defective capacitors;

c.     Misleading customers, including Dr. Statler and members of the prospective class, who, often seeking repair or replacement remedies available to them by warranty or contract or otherwise, called in or otherwise reported problem behavior in, or the failures of, their Optiplex

computers, and concealing critical information from them, when Dell knew of a widespread and dangerous defect in Optiplex computers and one that was likely to recur if those computers were repaired with motherboards bearing the same defect;

        d.     Giving preferential treatment to certain customers, including by way of providing information to them re: the defects or offering or providing proactive motherboard replacements to them, or both, while not providing the same to other customers;

        e.     Using defective parts to effect "repairs," including used parts, when it knew or should have known that those parts were defective or likely to fail; and

        f.     Failing to negotiate arbitration and no-class-action provisions and then inserting them into Terms and Condition documents anyway, as part of its efforts to discourage aggrieved customers from having their days in court.

        96.     Dell willfully engaged in such practices knowing them to be unfair or defective, and with the intent that Dr. Statler and the prospective class would act or fail to act in manners designed to advance Dell's commercial interests.

        97.     The wrongful conduct alleged in this complaint occurred, and continues to occur, in the ordinary course of Dell's business or occupation, and it has caused great harm to Dr. Statler and the prospective class, who were foreseeable and direct victims thereof.

        98.     Dell has injured the public interest, and Dell's actions continue to pose a threat to the public.

        99.     As a direct and legal result of Dell's misleading, deceptive, unfair, false, and fraudulent trade practices, Dr. Statler and the prospective class have sustained damages in amounts to be proven at trial.

100.    Dr. Statler and the prospective class seek all damages lawfully recoverable as they relate to their purchase of defective Dell computers, and to Dell's post-sale conduct, to include but not be limited to, the cost of the defective computers, together with any interest paid; the cost of repair attempts made by others, including the cost of any parts or supplies; and cover costs, as well as all other lawful damages to be proven at trial, or, in the alternative, $50 (fifty dollars), whichever is greater.  N.Y. Gen. Bus. § 349(h).  In addition, if actual damages are awarded, Dr. Statler seeks trebling of his award, to $1,000 (one thousand dollars) due to Dell's willful or knowing violation of the law.  *Id.*  He also seeks injunctive relief to enjoin further violations of law and to effect remedies as requested in this complaint.  *Id.*  And he seeks the costs of suit, including a reasonable attorney's fee.  *Id.*  Dr. Statler also seeks all such damages on behalf of other class members as to whom N.Y. Gen. Bus. § 349 applies.

101.    If necessary to maintain this matter as a class action, Dr. Statler will forego his Section 349 right to treble damages up to $1,000.  N.Y. Gen. Bus. § 349(h).

102.    Dell's actions and omissions as described in this complaint also have violated the consumer protection statutes of various other states, where it has behaved similarly with regard to consumers who reside in those states.  These actions and omissions, which have included intentional and repeated deception, false promise, misrepresentation, and/or concealment, suppression, or omission of material fact, among other unconscionable behaviors, including unfair trade practices, have affected the public interest in those various states.  Members of the prospective class seek the full measure of relief available at law and equity (to include injunctive and declaratory relief as available) under the laws of those various states, including multiplication of actual damages as allowed by law, together with the cost of suit, including reasonable attorneys' fees.  In this proposed nationwide class action, the state laws under which the prospective class seeks relief include:

    a.    Ariz. Rev. Stat. § 44-1522, *et seq.*;

    b.    Ark. Code § 4-88-101, *et seq.*;

    c.    Cal. Bus. & Prof. Code §§ 17200 and 17500 *et seq.*;

d.      Colo. Rev. Stat. § 6-1-101, *et seq.*;

e.      Conn. Gen. Stat. § 42-110a, *et seq.*;

f.      6 Del. Code § 2511, *et seq.*;

g.      D.C. Code § 28-3901, *et seq.*;

h.      Fla. Stat. § 501.201, *et seq.*;

i.      Haw. Rev. Stat. § 480, *et seq.*;

j.      Idaho Code § 48-601, *et seq.*;

k.      815 ILCS § 505/1, *et seq.*;

        815 ILCS § 510/1, *et seq.*;

l.      Kan. Stat. § 50-626, *et seq.*;

m.      Ky. Rev. Stat. Ann. § 367.110, *et seq.*;

        Ky. Rev. Stat. Ann. § 365.020, *et seq.*;

n.      Md. Com. Law Code § 13-101, *et seq.*;

o.      Mich. Stat. § 445.901, *et seq.*;

p.      Minn. Stat. § 325F.68, *et seq.*;

        Minn. Stat. § 325D.45, *et seq.*;

q.      Vernon's Mo. Rev. Stat. § 407.010, *et seq.*;

r.      Neb. Rev. Stat. § 59-1601, *et seq.*;

        Neb. Rev. Stat. § 87-301, *et seq.*;

s.      Nev. Rev. Stat. § 598.0903, *et seq.*;

t.      N.C. Gen. Stat. § 75-1.1, *et seq.*;

u.      N.H. Rev. Stat. § 358-A:1, *et seq.*;

v.      N.J. Stat. Ann. § 56:8-1, *et seq.*;

w.      N.M. Stat. Ann. § 57-12-1, *et seq.*;

x.      N.Y. Gen. Bus. Law § 349, *et seq.*;

y.      N.D. Cent. Code § 51-15-01, *et seq.*;

z.      Ohio Rev. Stat. § 1345.01, *et seq.*

(by way of violation of Ohio Admin. Code 109:4-3-10(A));

Ohio Rev. Stat. § 4165.01, *et seq.*;

aa.    Okla. Stat. tit. 15 § 751, *et seq.*;

bb.    Or. Rev. Stat. § 646.605, *et seq.*;

cc.    R.I. Gen. Laws. § 6-13.1-1, *et seq.*;

dd.    S.C. Code Laws § 39-5-10, *et seq.*;

ee.    S.D. Code Laws § 37-24-1, *et seq.*;

ff.    Tex. Bus. & Com. Code § 17.46, *et seq.*;

gg.    Vt. Stat. Ann. tit. 9, § 2451, *et seq.*;

hh.    RCW 19.86.010, *et seq.*; and

ii.    Wis. Stat. § 100.18, *et seq.*

## COUNT IV
## Unjust Enrichment

103.    Plaintiff restates the preceding paragraphs and incorporates them here by this reference.

104.    By its wrongful acts and omissions as alleged in this complaint, including by way of the sale of computers it knew or should have known to be defective, its concealment of the cause of grave problems experienced by its customers with their computers, and its "repair" of computers by way of defective parts, Dell has been unjustly enriched at the expense of its customers, including Dr. Statler.

105.    Under the instant circumstances, it would be wrong for Dell to retain the profits, compensation, and other monetary benefits it has enjoyed due to the transactions at issue.

106.    Dr. Statler is entitled to an order requiring Dell to disgorge to him all profits, compensation, and any other benefits it obtained by way of its wrongful acts and omissions as they pertain to his defective computers.

107.    These allegations also apply with respect to transactions and wrongful acts and omissions with other members of the class, who seek the same remedies.

**PRAYER FOR RELIEF**

WHEREFORE, having stated the foregoing allegations and claims, Dr. Statler prays:

A.    That the Court determine that this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to his and the prospective class's claims for equitable and injunctive relief, including declarative relief, and Rule 23(b)(3) of the Federal Rules of Civil Procedure with respect to their claims for damages, and that the Court appoint him representative of the class and his attorneys as counsel for the class;

B.    That Dell's wrongful conduct alleged herein be declared, adjudged, and decreed to be unlawful;

C.    That the Dell warranty documents be re-formed as necessary, or that certain provisions therein be disregarded as invalid or unenforceable, to permit him and the class the panoply of remedies available to him under Article 2 of the Uniform Commercial Code (or the applicable provisions of the Civil Code of Louisiana, as appropriate) as adopted in their respective states, or otherwise, including pursuant to the Magnuson-Moss Warranty Act and Article 2 of the Uniform Commercial Code;

D.    That he and the class be awarded the full panoply of remedies available to them under Article 2 of the Uniform Commercial Code (or the applicable provisions of the Civil Code of Louisiana, as appropriate) as adopted in their respective states, both thereunder and pursuant to the Magnuson-Moss Warranty Act, including but not limited to refunds for the cost of the subject computers (or in the alternative for the cost of true, safe, and functional repairs, if available), replacement costs, any costs already incurred for repair or replacement (to include

parts and supply costs); the cost of any purchased extended warranties; and interest on any installment plan used to purchase (used broadly) the computers;

E.     That he and the class be afforded all remedies available to them at law or equity, including but not limited to, awards of damages under the consumer protection laws of the various states, as applicable, in such amounts to be determined at trial, but to include refunds for the cost of the subject computers; any costs already incurred for repair or replacement, including parts and supplies; the cost of any extended warranties; and interest on any installment plan used to purchase (used broadly) the computers, with trebling or other multiplying where permitted by law;

F.     That he and the class be granted an award of punitive damages as available at law or equity, and in an amount to be determined at trial;

G.     That Dell be ordered to disgorge its profits and other wrongful monetary gain to Dr. Statler and the class, in order to remedy the unjust enrichment it has enjoyed as a result of the actions and omissions complained of here;

H.     That if for whatever reason monetary relief is not available, or in addition to monetary relief, Dell be ordered by way of an injunction to repair or replace the subject computers, including by way of recall or otherwise;

I.     That Dell be ordered to notify its affected customers of the defects alleged herein, and all other defects in the subject computers, so that they may avail themselves of the remedies ordered by this Court;

J.     That he and the class recover their costs of suit, including reasonable attorneys' fees and expenses as provided by law, and including expert witness fees as allowed under the Magnuson-Moss Warranty Act or otherwise;

K.      That he and the class recover prejudgment interest at the maximum amount permitted by law;

L.      That he and the class be permitted leave to amend their complaint as necessary, including to conform to evidence produced at trial; and

M.      That he and the class be granted such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## DEMAND FOR JURY

Dr. Statler and the prospective class respectfully demand a jury trial on all issues so triable.

DATED:  November 29, 2010.          HAGENS BERMAN SOBOL SHAPIRO LLP


By _____ s/ Davis S. Nalven _____
   David S. Nalven, DN-2374
55 Cambridge Parkway, Suite 301
Cambridge, Massachusetts  02142
Telephone:  (617) 482-3700
Facsimile:   (617) 482-3003


HAGENS BERMAN SOBOL SHAPIRO LLP


By _____ s/ Robert F. Lopez _____
   Steve W. Berman (*pro hac vice*)
   Robert F. Lopez, (*pro hac vice*)
1918 Eighth Avenue, Suite 3300
Seattle, Washington  98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594

Michael P. Lewis, *pro hac vice*
LEVETOWN & JENKINS, LLP
1 Metro Center
700 12th St. N.W., Suite 700
Washington, DC  20005
Telephone:  (202) 379-4899
Facsimile:  (866) 278-2973

*Attorneys for Richard Statler, D.C., and the
Proposed Class*